**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jose P. Campos, | No. CV-06-610-PHX-DGC |
| Plaintiff, | |
| vs. | **ORDER** |
| City of Glendale, et al., | |
| Defendants. | |

Defendants have filed a motion for summary judgment. Dkt. #41. For the reasons set forth below, the Court will grant Defendants' motion in part and deny it in part.

**I.     Background.**

**A.     Plaintiff's Arrest.**

The facts, either undisputed or stated in the light most favorable to Plaintiff, are as follows.[1] At approximately 1:50 a.m. on the morning of March 1, 2005, City of Glendale police officers were dispatched to the residence of Plaintiff Jose P. Campos. The officers were responding to a 911 call that gun shots were fired in the vicinity of Plaintiff's home. Officers Carlos Cano and Luis Garcia were the first to arrive. A witness at the scene reported

---

[1] Plaintiff disputes some facts asserted by Defendants without providing any citation to controverting evidence. *See, e.g.,* Dkt. #53 at 6, ¶¶13-15. Where evidence provided by the parties supports only the Defendants' version of events, that version is accepted as true for purposes of this motion. The Court also notes that Plaintiffs' response and supporting statement of facts (Dkt. ##43, 53) were filed under seal without prior approval of the Court. The Court will order the Clerk to unseal these filings.

1  that a Hispanic male had fired four or five shots into the air while seated in a truck in front
2  of the house, and then had fired another shot either in the house or the backyard of the house.
3        While Officers Garcia and Cano waited for assistance, Javier Robles emerged from
4  Plaintiff's residence.  The officers commanded Robles to approach them with his hands in
5  sight, but he ran back into the house.  Officers Garcia and Cano were joined by Sergeant
6  Marc McClausin and Officer B. Shackelford. Shortly thereafter, Robles and Martin Campos,
7  Plaintiff's brother, exited the residence and were placed in custody without incident.  Robles
8  informed the officers that he was responsible for firing the gun and that a third individual,
9  Plaintiff, was asleep inside the residence.  Robles  also stated that Plaintiff may be hard of
10 hearing.
11       The officers decided to search the house.  As Sergeant McClausin stated, the officers
12 "felt it necessary to enter the residence to confirm that there was nobody inside who had
13 sustained any injuries, whether intentional or accidental."  Dkt. #42 Ex. A at 6.  Officer
14 Garcia likewise stated that the officers were interested in conducting a "welfare check" in
15 order "to make sure that there was no one in [the home] that needed assistance as far as
16 safety[.]"  Dkt. #53 Ex. 3 at 3.
17       Officer Shackelford made an announcement, in Spanish and English, prior to the
18 officers entering the residence.  He identified the officers as members of the City police
19 department and warned that a police dog would find and bite anyone inside.  Officer
20 Shackelford then instructed his police dog to bark, which the dog did for two to three
21 minutes. Upon receiving no response from the person reportedly inside, the four officers and
22 the dog entered the home.
23       The officers and the dog cleared each room of the house and came to a back bedroom
24 where Plaintiff appeared to be sleeping on the bed under a comforter.  Officer Shackelford
25 announced the officers' presence and again instructed the dog to bark.  Plaintiff did not
26 respond.  The officers entered the room and commanded Plaintiff to show his hands.
27 Plaintiff did not respond.  The officers then removed the comforter covering Plaintiff.
28       Plaintiff was lying on his back in boxer shorts.  There were pillows on the bed.

Plaintiff did not appear to be injured. He still did not respond to the officers' or dog's presence.

Thinking that Plaintiff might be hearing impaired, Sergeant McClausin touched Plaintiff to get his attention. Plaintiff rolled onto his left side, away from the officers, so that his hands were not visible. Sergeant McClausin grabbed Plaintiff's right arm and rolled him onto his back, but he again turned away. Sergeant McClausin grabbed Plaintiff's right wrist and tried to pull him onto his back, but Plaintiff pulled away. Officer Cano was able to get a handcuff on Plaintiff's right wrist, but he recoiled and did not open his eyes or respond to the officers. The officers concluded that Plaintiff was intentionally resisting them. Sergeant McClausin stated that Plaintiff "almost had a smirk on his face." Dkt. #42 Ex. A at 10.

When the officers were unable to place Plaintiff in custody, Sergeant McClausin placed his taser gun on Plaintiff's back and fired it. When this did not result in Plaintiff's compliance, Sergeant McClausin fired the taser four or five more times. The officers were then able to place Plaintiff on the floor and handcuff him.

Once in custody, Plaintiff told Officer Cano that he did not hear the commands or warnings given by the officers because he was sleeping. Plaintiff, who had been drinking that night, testified that it was only upon being placed on the floor that he realized that police officers were in his room. Plaintiff later testified that he did not feel pain from the taser, although he was unable to move when he awoke on the floor.

**B.     This Action.**

Plaintiff was arrested for obstructing police in violation of Glendale City Code § 26-22. The charge was dismissed on May 31, 2005. Plaintiff subsequently filed suit against the City, Sergeant McClausin, Officer Cano, Officer Garcia, Officer Shackelford, and their spouses (collectively, "Defendants"). Dkt. #5. The complaint contains claims for assault/aggravated assault (Count 1), excessive/improper use of force (Count 2), false arrest/detention (Count 3), illegal entry (Count 4), negligence/gross negligence (Count 5), negligent supervision and training (Count 6), and conspiracy (Count 7). *Id*.

The parties stipulated to dismissal of Count 6, and the Court granted Defendants'

1  motion to dismiss Plaintiff's state law claims (Counts 1 and 5).  Dkt. ##39, 50; *see* Dkt. #52
2  at 5.  Defendants' motion for summary judgment seeks dismissal of Plaintiff's remaining
3  claims.  Dkt. #41.  These claims are brought under 42 U.S.C. § 1983, which provides a
4  remedy to any person who has been deprived of federal constitutional rights by individuals
5  acting under color of state law.  *See Kentucky v. Graham*, 473 U.S. 159 (1985).

6  **II.     Legal Standard.**

7  Summary judgment is appropriate if the evidence, viewed in the light most favorable
8  to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and
9  that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*
10 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[A] party seeking summary
11 judgment always bears the initial responsibility of informing the district court of the basis for
12 its motion, and identifying those portions of [the record] which it believes demonstrate the
13 absence of a genuine issue of material fact." *Id*. at 323.  Summary judgment may be entered
14 against a party who "fails to make a showing sufficient to establish the existence of an
15 element essential to that party's case, and on which that party will bear the burden of proof
16 at trial." *Id*. at 322.

17 **III.    Discussion.**

18        **A.    Excessive/Improper Use of Force.**

19               **1.    Constitutional Violation.**

20 The "constitutional standard [that] governs a free citizen's claim that law enforcement
21 officials used excessive force in the course of making an arrest" is supplied by the Fourth
22 Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  A court reviewing an excessive
23 force claim is to examine whether an officer's conduct was "reasonable" by "carefully
24 balancing [the] nature and quality of the intrusion on the individual's Fourth Amendment
25 interests against the countervailing governmental interests at stake." *Id*. at 396 (internal
26 quotes and citations omitted).  "As in other Fourth Amendment contexts . . . the
27 'reasonableness' inquiry in an excessive force case is an objective one:  the question is
28 whether the officers' actions are 'objectively reasonable' in light of the facts and

- 4 -

1  circumstances confronting them, without regard to their underlying intent or motivation."
2  *Id*. at 397. The Supreme Court has instructed courts to consider, among other things, "the
3  severity of the crime at issue, whether the suspect poses an immediate threat to the safety of
4  the officers or others, and whether he is actively resisting arrest or attempting to evade arrest
5  by flight." *Id*. at 396 (citation omitted). Considering these three factors, the Court concludes
6  that Plaintiff has not established a constitutional violation.

7  First, the officers were present on the night in question because gunshots had been
8  fired. An individual in the house had fired a gun four or five times outside the house and
9  once in the house or backyard. Although Robles said he fired the gun, the officers did not
10 know this to be true. Robles had not surrendered the gun, and it had not been recovered
11 before the officers encountered Plaintiff. The severity of the crime at issue – unlawful
12 gunfire – warranted extreme caution on the part of the officers.[2]

13 Second, reasonable officers would believe that Plaintiff posed a threat to their safety.
14 Plaintiff was located in a house where a gun had been fired; the gun had not been located;
15 Plaintiff did not respond to the officers, even after numerous commands and substantial
16 commotion; the officers could not see whether Plaintiff had a gun concealed on the bed
17 beneath himself or in the pillows; and Plaintiff physically resisted the officers' efforts to roll
18 him on his back and place him in a position where officer safety could be assured. Plaintiff
19 claims that he was sleeping, but the officers' did not know that for a fact, and reasonable
20 officers could conclude that Plaintiff would not sleep through verbal commands, a barking
21 dog, physical touching, the presence of four officers and a dog in his bedroom, and physical
22 efforts of two officers to roll him on his back. The fact that Plaintiff, in these circumstances,
23 physically resisted the officer's efforts to display his hands and assure he did not have a
24 weapon would have led reasonable officers to conclude that Plaintiff presented a threat to

---

[2]Robles reportedly told another officer that the gun was in a bedroom, partially disassembled. The officer's report does not make clear whether this information was shared with the other officers before they entered the house. Even if it was, however, the entering officers did not know the information to be true.

1 their safety. Plaintiff could have rolled over with a gun in his hands and fired before the
2 officers had time to react.

3 Third, Plaintiff actively resisted the officers. He did not respond to their commands.
4 He pulled his arm away more than once. He resisted being turned over. And he rolled to a
5 position where the officers could not see his hands to determine if he had a firearm.

6 The Supreme Court in *Graham* "did not . . . limit the [reasonableness] inquiry to
7 [these three] factors." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). In *Chew*
8 *v. Gates*, 27 F.3d 1432 (9th Cir.1994), the Ninth Circuit identified additional factors that
9 courts have used in a reasonableness analysis: "whether a warrant was used, whether the
10 plaintiff resisted or was armed, whether more than one arrestee or officer was involved,
11 whether the plaintiff was sober, whether other dangerous or exigent circumstances existed
12 at the time of the arrest, and the nature of the arrest charges." *Id*. at 1441 n.5.

13 Two of the factors in this list – whether the officers were in the house lawfully and
14 the seriousness of the matter they were investigating – confirm the reasonableness of
15 Defendants' conduct. The officers did not have a warrant, but their entry into Plaintiff's
16 house was justified by exigent circumstances. Shots had been fired – one possibly in the
17 house; the officers were told a person was in the house; that person was not responding to
18 the officers' commands or the barking dog. Given these facts, the officers were justified in
19 entering the house to determine whether the person was in need of medical attention. *United*
20 *States v. Vaatausili*, 313 F.3d 1188, 1192-93 (9th Cir. 2002) ("Exigent circumstances are
21 present when a reasonable person [would] believe that entry . . . was necessary to prevent
22 physical harm to the officers or other persons[.]") (citation omitted; alterations in original);
23 *see Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("'The need to protect or preserve life or
24 avoid serious injury is justification for what would be otherwise illegal absent an exigency
25 or emergency.'") (citation omitted). And although the basis on which Plaintiff ultimately
26 was arrested was relatively minor – obstructing police officers – Defendants were at
27 Plaintiff's house on a far more serious matter: unlawful gunfire in the middle of the night.
28 Plaintiff contends that the use of a taser on a sleeping person is unreasonable. Stated

so simply, the Court would agree. But when all of the circumstances confronting the officers are considered, the Court concludes that the officers' actions were reasonable. The officers were in a house where shots had been fired; they had not recovered the gun; they encountered a person who did not respond to their commands; they could not see whether the person had the gun, and therefore were faced with a person who might be in possession of a deadly weapon; the person physically resisted efforts to place him in a position where he would pose no threat to the officers' safety; and physical force had not succeeded in bringing about his compliance. In these circumstances, the officers acted reasonably in deploying additional force to secure Plaintiff's compliance and their own safety.

Plaintiff repeatedly emphasizes that Robles had admitted to firing the gun, as though this fact alone eliminated any grounds for suspecting Plaintiff. But there is no evidence that the officers knew Robles or Plaintiff before this encounter. The officers were called to a house in the middle of the night where shots had been fired. They were not required, as a matter of constitutional law, to place complete trust in the statement of Robles – a stranger who initially had fled back into the house when they arrived. The officers were entitled to treat Robles' statements with caution and to deal with Plaintiff as they would any person who might pose a threat to their safety. Having tried to ensure their safety by directing Plaintiff to comply and then by trying physically to move Plaintiff into a safe position, and having been unsuccessful due to Plaintiff's active resistance, the officers acted reasonably when they brought additional force to bear to secure Plaintiff's compliance.[3]

The Ninth Circuit has held that the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.2001). The "consideration of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain,

---

[3] The Court reaches the same conclusion with respect to the number of taser strikes employed by the officers. The undisputed facts show that first strike had no effect. The officers acted reasonably in deploying additional strikes until Plaintiff complied.

- 7 -

and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Id*. (quoting *Graham*, 490 U.S. at 396) (citations omitted).

### 2. **Qualified Immunity.**

Even if use of the taser could be viewed as unreasonable, the Court concludes that Defendants would be entitled to qualified immunity. "[I]f a [constitutional] violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202 (citation omitted). If the Fourth Amendment right was clearly established, but the officer made a mistake regarding what the law required, the officer is entitled to the immunity defense if the officer's mistake was reasonable. *Id.* at 205. The Court, applying a "reasonable officer" standard, determines whether the officer's conduct was reasonable. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). The Court makes this determination based on the information the officer possessed at the time of the alleged constitutional violation. *Hunter*, 502 U.S. at 227; *see Katz*, 533 U.S. at 207 ("Excessive force claims, like most Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.").

As explained above, the Court concludes that a reasonable officer in Defendants' position would have believed that use of a taser was necessary. Some force clearly was required to make Plaintiff's hands visible and place him in a position to assure officer safety. After unsuccessfully using physical force to turn Plaintiff over, and given the fact that a deadly weapon was potentially within Plaintiff's reach, the officers reasonably could have concluded that a taser was needed to bring him into compliance and ensure their safety.

**B.     False Arrest/Detention.**

**1.     Constitutional Violation.**

Under the Fourth Amendment, a warrantless arrest is constitutional if it is based on probable cause. *United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983) (citation omitted). The probable cause standard for arrest is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Plaintiff was arrested for violating Glendale City Code § 26-22, which provides that "[a]ny person who shall knowingly or willfully obstruct . . . delay, resist, or oppose any policeman" in the performance or attempted performance of the officer's duties "shall be guilty of a misdemeanor."

The officers clearly were discharging their duties when they entered Plaintiff's house to see if anyone was injured and when they sought to secure their own safety upon encountering Plaintiff. Plaintiff clearly resisted their efforts to secure their safety, disregarding their verbal commands and their physical efforts to place Plaintiff in a position where his hands could be seen. Given these circumstances, the officers had probable cause to believe that Plaintiff knowingly and willingly obstructed and resisted their efforts to discharge these duties, in violation of § 26-22.

**2.     Qualified Immunity.**

In the false arrest context, "the qualified immunity inquiry requires [courts] to consider whether, under the circumstances, it was objectively reasonable for the officers to believe that there was probable cause to arrest" Plaintiff for obstructing police. *Beier v. City of Lewiston*, 354 F.3d 1058, 1068 (9th Cir. 2004). For the reasons set forth above, the Court concludes that it was objectively reasonable for Defendants to believe that Plaintiff was resisting and obstructing the discharge of their duties. Even if Plaintiff did not do so knowingly and willingly because he was asleep, Defendants did not know for certain that he was sleeping, and a reasonable person clearly would be warranted in concluding that no person could sleep through the noise, touching, and physical force in Plaintiff's bedroom.

- 9 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C. Illegal Entry.

#### 1. Constitutional Violation.

As noted above, the officers' initial entry into the house was justified by exigent circumstances – to ensure that the person still within the house had not been injured by the reported gunfire. Plaintiff does not contend otherwise.

Plaintiff does argue, however, that Defendants acted without exigent circumstances when they entered the house a second time – after Plaintiff had been arrested – to search for the gun. Defendants counter that exigent circumstances existed because of the risk that the gun might be destroyed or cleansed by Robles or Martin Campos, both of whom were released after initially being detained.

"Exigent circumstances are present when a reasonable person [would] believe that entry . . . was *necessary* to prevent . . . the destruction of relevant evidence[.]" *United States v. Vaatausili*, 313 F.3d 1188, 1192-93 (9th Cir. 2002) (alterations in original; emphasis added). Defendants do not contend that they sought the consent of Plaintiff, Robles, or Martin Campos to search for the gun, nor do they contend that it was impossible to obtain a telephone warrant during the time that Robles and Martin Campos were detained. *See United States v. Alvarez*, 810 F.2d 879, 883 (9th Cir.1987) (noting that, where exigency is claimed, the courts have required "the government either to attempt, in good faith, to secure a warrant, or to present evidence explaining why a telephone warrant was unavailable or impractical.") (citation omitted). Exigent circumstances mean urgent necessity. The Court cannot conclude, as a matter of undisputed fact, that such necessity required the officers to enter the house a second time without a warrant.

#### 2. Qualified Immunity.

The warrant requirement is clearly established by the law. The Court cannot conclude, as a matter of undisputed fact, that a reasonable officer would have concluded that the second entry was justified by exigent circumstances. Defendants therefore are not entitled to summary judgment on the basis of qualified immunity with respect to the second entry.

- 10 -

**D.    Conspiracy.**

To prove a conspiracy under § 1983, a plaintiff "must show an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc) (internal quotes and citation omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* at 1541. "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999).

The only alleged constitutional violation that survives Defendants' motion for summary judgment is the unlawful entry claim based on the officers' second entry into Plaintiff's home. Plaintiff's response does not address the alleged conspiracy with respect to this violation. Plaintiff has presented no evidence to show which officers entered the house the second time, and no evidence to support a claim that Defendants conspired to make the unlawful entry. Summary judgment may be entered against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The Court therefore will enter summary judgment on Plaintiff's conspiracy claim.

**IT IS ORDERED:**

1. Defendants' motion for summary judgment (Dkt. #41) is **granted** with respect to Plaintiff's claims for excessive force (Count 2), false arrest (Count 3), illegal entry with respect to the first entry of Plaintiff's house (Count 4), and conspiracy (Count 7). The motion is **denied** with respect to the second entry of Plaintiff's house (Count 4).

2. The Court will schedule a final pretrial conference by separate order.

3.     The Clerk is directed to unseal Dkt. ##43, 53.

DATED this 14th day of December, 2007.

_____
David G. Campbell
United States District Judge

- 12 -